89 Cal.App.2d 664 (1949)
Estate of HELEN MONTGOMERY, Deceased. OTIE BROWN, as Administratrix, etc., Appellant,
v.
BERNICE JACKSON, Individually and as Executrix, etc., Respondent.
Civ. No. 16573. 
California Court of Appeals. Second Dist., Div. One. 
Jan. 13, 1949.
 Hugh E. Macbeth, Eva M. Mack and Hugh E. Macbeth, Jr., for Appellant.
 Arthur G. Baker for Respondent.
 YORK, P. J.
 It appears from the record herein that the last will of Helen Montgomery, deceased, was admitted to probate on October 28, 1946, and that letters testamentary were issued to Bernice Jackson, who was named in the will as executrix thereof. Thereafter, to wit: on July 21, 1947, Isabelle McKenzie, the mother of decedent, filed her petition for a decree determining the interests of parties involved in said estate of Helen Montgomery. Subsequently, Isabelle McKenzie died, and Otie Brown was duly appointed administratrix of her estate. This appeal is prosecuted by Otie Brown, as such administratrix, from the judgment entered herein to the following effect:
 "It is hereby ordered, adjudged and decreed:"
 "(1) That said Isabelle McKenzie take nothing by her petition herein aforesaid;"
 "(2) That the Will of said decedent is a valid Will in all respects and was witnessed by two sufficient witnesses thereto besides the devisee Bernice Jackson, and that the said Bernice Jackson is entitled to take such devise, legacy and bequest as is given to her under the terms of said Will."
 Said judgment is based upon the following findings of fact: "The Court finds that said will was entirely written and signed by said Testatrix on the 9th day of May, 1946; that said Testatrix did not date the same in her handwriting; that said Testatrix subscribed said Will at the end thereof; *666 that at the time of subscribing said Will, she declared to the witnesses Edward J. Westbrook and Cliffie C. Westbrook and Bernice Jackson, all three of whom were then and there present, that it was her Will, and she then and there requested them to act as witnesses to her said will; and the said Edward J. Westbrook and Bernice Jackson then and there, and in the presence of the Testatrix, subscribed thereto as witnesses, their signatures following immediately the signature of the Testatrix, and then and there at the same time and in the presence of the Testatrix, said Cliffie C. Westbrook subscribed to said Will as a witness thereto by writing her signature on a Notarial Certificate form, with her notarial seal impressed, and by firmly and permanently attaching the same to said Will immediately below the signature of said Decedent; ..."
 "The Court further finds that the said witnesses Edward J. Westbrook and Cliffie C. Westbrook take nothing by the Will of said Decedent, and are therefore competent witnesses to said Will, irrespective of the witnessing and signing of said Will by said Bernice Jackson, devisee under said Will." The following issues are submitted by appellant for determination:
 "I. The judgment determining heirship herein and from which judgment this appeal is made is one which sustains a collateral attack upon the decree of the Court admitting the Will to probate. This attack is in violation of the doctrine of res judicata and is particularly in violation of the terms of Section 380 and 384 of the Probate Code."
 "II. The evidence before the Trial Court does not support the Findings of Fact and Conclusions of Law as to the due execution of the Will and attestation thereof by two witnesses in addition to the witness Bernice Jackson, who, by the terms of said Will is devisee."
 In connection with the first proposition, appellant asserts that at the time the will of Helen Montgomery was admitted to probate on October 28, 1946, the court found that the said will was witnessed by Edward J. Westbrook and Bernice Jackson, the executrix, and that the latter was ineligible to take under the will. Hence, that the proponent of that will is judicially estopped to attack the will and to prove another and different will with other and different witnesses.
 At the hearing of October 28, 1946, the will herein was proved and admitted to probate on the testimony of respondent Bernice Jackson, one of the witnesses thereto, and who was named therein as executrix and also as a devisee. The *667 court made no findings except to admit the will to probate and to comment as follows: "The witness is ineligible to take under the will."
 [1] As stated in 26 California Jurisprudence, page 1068, section 335: "When the proponent presents to the probate court an instrument or instruments which he claims to be the will of a deceased person, and petitions to have the writing or writings admitted to probate, the only question before the court is as to whether or not the propounded paper or papers constitute the will of the decedent. (Estate of Murphy, 104 Cal. 554, 566 [38 P. 543].) A proceeding which involves the admissibility of a testamentary writing to probate does not concern itself with the construction or interpretation of the provisions of the instrument. (Estate of Cook, 173 Cal. 465, 468 [160 P. 553]; Estate of Plaut, 27 Cal.2d 424 [164 P.2d 765, 162 A.L.R. 837].) Doubtless, in order to discover the character of the writing, as being testamentary or otherwise, the court may look somewhat into the body of the writing; but questions relating to the interpretation properly arise only after the paper has been admitted to probate."
 In Estate of Plaut, supra, at 427, it was held that "Upon the contest of a will, whether before or after probate, the court will ordinarily not construe the instrument. (Estate of Cook, 173 Cal. 465, 468 [160 P. 553]; Estate of Fay, 145 Cal. 82, 87 [78 P. 340, 104 Am.St.Rep. 17]; Estate of Pforr, 144 Cal. 121, 125 [77 P. 825]; Estate of Murphy, 104 Cal. 554, 566 [38 P. 543]; Estate of Cobb, 49 Cal. 599, 604; see 2 Woerner, Administration, 3d ed., 744.) The only issue before the court is whether the instrument contested is or is not the will of the testator, and the power to construe will be exercised only insofar as it is necessary to the determination of that issue. (See Estate of Murphy, supra, and cases cited in 2 Page on Wills, 3d ed., 639.)"
 In Estate of Cook, supra, it was stated: "The only question before the superior court on a petition for the probate of one or several writings claimed to constitute a will is, does it or they constitute the will of the deceased--is a testamentary disposition of property intended and disclosed by the writings? The court is limited solely to that inquiry. In determining whether an instrument proffered for probate is, or is not, a will, the court cannot ordinarily enter into any consideration of the construction of the will, resolve inconsistencies in the disposition of property or construe the provisions of the instrument." *668
 [2] At the time the will was admitted to probate, no question arose as to its validity and no contest was thereafter instituted within the six-month statutory limitation. About nine months after the will was admitted to probate, the instant petition to determine heirship was filed by appellant in which it was alleged that under the terms of section 51 of the Probate Code the devise of the real property to respondent Bernice Jackson was void by reason of the fact that she was one of the subscribing witnesses to the will, said petition praying for a declaration "of the rights of all persons to said estate under the will."
 In the circumstances, it appears unseemly for appellant to claim respondent is estopped to present proof in answer to appellant's petition in order to show that the devise to her by testatrix is valid.
 [3] In support of her second point on appeal, appellant urges that "the qualifications and procedures to be carried out by a competent witness to a will are specifically set forth in section 50 of the Probate Code"; and that "Nowhere is there any provision in the Probate Code for the attestation of a notary public as a competent witness."
 Mrs. Westbrook testified that on May 9, 1946, Mrs. Montgomery, accompanied by Mrs. Jackson, came to her office and said: " 'I want to have a will notarized,' and handed me a will, and said 'Will you read it to yourself?' And I read it, and I told her that it did not have to be notarized to strengthen the validity of the will, because it was a holographic will. She said, 'Are you a notary?' and I said, 'Yes, I am.' She said, 'Do you serve the public?' I said, 'I do.' She said, 'If you don't do it I can go some place else.' I said, 'I will notarize it.' She turned around to my client and said, 'Will you witness?' My client said, 'No.' I said, 'Well, I will get my husband to witness,' and I called to my husband and he came and witnessed her signature. Q. How do you mean, he witnessed her signature; he signed his name to it, too? A. Yes, 'Edward J. Westbrook,' if I recall. Q. Did she tell your husband that was her will and ask him to witness it? A. She said, 'Yes, this is my will.' Q. In your presence right there too? A. Yes. Q. Did Mr. Westbrook sign it then? A. Yes; he was a witness to her signature in the presence of me. Q. And then you also attached your notarial certificate, did you? A. Yes. Q. I will ask you if this is the notarial certificate here, which is in the envelope with this will as a part of it? A. Yes, that is a part of the will. Q. In other words, this notarial certificate you *669 have here now in your hands is the one attached to this will, is it? A. Yes, sir. I can see where it has been torn apart. ... Q. At the time that Mr. Westbrook signed, was Mrs. Montgomery's signature on there? A. No. After she put her signature then he signed, and then I put 'Witness.' Q. She signed first before anybody signed? A. That is right, and he was standing on my right and she was standing on the left. ... Q. Then she asked you and Mr. Westbrook to act as witnesses in signing? A. She asked me to notarize it and she asked Mr. Westbrook to witness. Q. Which he did, as a witness, and which you did, as notary? ... A. Yes, sir."
 On cross-examination this witness testified that "Mrs. Montgomery said, 'Will you witness my will?' to one of my clients, and my client refused. I said, 'I will get Mr. Westbrook.' Q. Did Mrs. Montgomery say anything at all after your client refused? A. No, until I told her that I would get Mr. Westbrook. Q. Then what, if anything, did she say? ... A. She didn't say anything. ... Q. Now, who asked Mr. Edward J. Westbrook to sign this document? A. I asked him to be a witness. ... Q. And Helen Montgomery did not ask him? A. No, she asked my client. Q. But she did not ask your husband? A. No." On redirect this witness testified that when her client refused to act as a witness to the will, she told Mrs. Montgomery: "I will get my husband to witness." That her husband and Mrs. Montgomery did not speak to each other, but that her husband said in the presence of Mrs. Montgomery, "Yes, I will be a witness. Q. And then he saw her sign the will? A. Oh yes ... Q. And you saw her sign the will too? A. Yes. Q. You testified she made no objection to your calling your husband to act as a witness? A. No."
 This witness further testified that she typed the notarial certificate; that "I signed after Mr. Westbrook and Mrs. Montgomery signed their names, and then I signed my name, and then I put the seal on last. I always do my typing first." That it was her intention to sign as a notary only, and not as a witness.
 Mr. Westbrook testified that Mrs. Montgomery signed the will in his presence and that he witnessed her signature; that he did not recall Mrs. Jackson signing in his presence; that the testatrix never asked him anything; that his wife asked him to act as a witness as she often did.
 Mrs. Jackson testified that she accompanied Mrs. Montgomery to the real estate office of the Westbrooks; that Mrs. Montgomery asked Mrs. Westbrook to notarize her will; that *670 Mrs. Westbrook "got a book to read up on it and Mrs. Montgomery asked her to read the will to herself. I stood over on the side while they talked. ... In the meantime Mr. Westbrook came in with a client. Mrs. Westbrook spoke to Mr. Westbrook about the will and he said it was all right to notarize it. ... Mrs. Westbrook said, 'You will have to have two witnesses.' And as I recall ... Mr. Westbrook said that she is a notary and she could not be a witness, as she notarized it, and he said, 'Let this lady sign that.' (referring to Mrs. Jackson.) ... Mrs. Montgomery says, 'I will let her witness the will, but turn it back. I don't want her to read it. Will you sign as a witness?' And she turned it back so I couldn't see what the contents were. Q. At that time had Mr. Westbrook signed? A. Yes, he had signed. ... Q. Mrs. Montgomery had already signed, had she? A. Yes, sir. ... Mrs. Westbrook put the seal on after Mr. Westbrook and I had signed the will. ... Q. After Mr. and Mrs. Westbrook signed and Mrs. Westbrook had attached the certificate to the will, what was done with the will? ... Mrs. Westbrook had given the will to Mrs. Montgomery in an envelope. I don't know whether she put it in her pocket or whether she carried it in her hand, but she gave it to me in the bank. Q. Was it sealed in this envelope when she handed it to you? A. Yes, it was sealed. Q. She told you to put it in your safe deposit box? A. Yes. Q. And you did. A. I did." That she did not see the will until after testatrix' death.
 On the question raised by appellant as to whether the signature of Mrs. Westbrook as a notary public was sufficient under section 50 of the Probate Code to constitute her an attesting witness to the will, respondent cites the case of Keely v. Moore, 196 U.S. 38 [25 S.Ct. 169, 49 L.Ed. 376]. In that case the validity of the will was attacked upon the ground, among others, that it had not the requisite number of witnesses to pass real estate in the District of Columbia. The testator was a resident of Washington, but at the time of his death was the American Consul at Southampton, England, one John H. Cooksey being his vice consul. The will in question was prepared by one Lomer, a resident solicitor, and was executed in his office; it was witnessed in the usual form by Lomer and by one Linthorne, a clerk in his office, who attached their signatures in the presence of and at the request of the testator, and in the presence of each other. On the day following the execution of the will, testator again went to the office of his solicitor, Lomer, who wrote a certificate of acknowledgment *671 in the margin of the second and last page of the will, which was signed by Cooksey, the vice consul. The prevailing law in force in the District of Columbia at the time required all devises of land to be in writing, signed by the devisor, and attested in his presence by three or four witnesses, otherwise such devise would be void and ineffective.
 The court there held at page 42 that "The certificate was probably prepared under the belief that wills, like deeds, made in a foreign country, must be executed and acknowledged before some official ... but as such certificate was unofficial, and contributes nothing, as such, to the validity of the will, it can only be looked upon as the affirmation of an ordinary witness to the facts therein stated. No particular form of attestation was necessary, as appears to be the case in England and in several of the United States; and if the certificate of Cooksey had been written at the foot of the will and signed by himself and by the two witnesses Lomer and Linthorne, it would have been a sufficient attestation. How, then, can it be regarded as insufficient when an attestation in one form is signed by two witnesses, and an attestation in another form by a third? Bearing in mind that the certificate, if given any force at all, must be considered an attestation, we do not think that the fact that it may have been written and signed under a mistaken impression as to its necessity and purpose vitiates it as an attestation. What use was intended to be made of it is immaterial, if it were useless for any purpose as an official certificate. The facts certified are appropriate to the attestation of the instrument, and, if true, we see no reason for holding it to be invalid as an attestation because it was signed under the impression that it was necessary for some possible purpose as a certificate."
 See, also, the early case of Panaud v. Jones, 1 Cal. 488, wherein it was held that under the civil law an escribano may act in the double capacity of escribano and witness, in the execution of a will; and that an alcalde, appointed in a will as executor but not named therein as heir or legatee, is competent to authenticate the will in his judicial capacity.
 A case in point is that of Tilton v. Daniels, 79 N. H. 368 [109 A. 145, 8 A.L.R. 1073]. There the applicable statute required three witnesses to a will. The document in question was signed as follows: "Thomas H. Daniels. Witnesses: Wilmer C. Cox, Amos Blake Signed before me, John R. Connor, Just. of Peace." *672
 "The contestant bases his claim to have the will disallowed upon the proposition that Connor did not sign as a witness."
 The court held: "In order that a will be duly authenticated, two things are required. It must be both 'attested and subscribed.' ... Attestation 'consists in the witnesses seeing that those things exist and are done which the statute requires.' ... 'Attestation is the act of the senses; subscription is the act of the hand; the one is mental; the other is mechanical.' Swift v. Wiley, 1 B.Mon. 114, 117. To attest the signature means to take note mentally that the signature exists as a fact. If this is done and the attestor also subscribes his name, the statute is complied with. The essential thing is that 'by the signature he meant to affirm that the deceased executed the will in his presence.' ... In this case Connor was requested to and did take note of the signature. At the testator's request, he was sworn by Connor to the truth of the asserted verity of the signature, and Connor certified that fact upon the will. ..."
 "The authorities are uniform. Such an execution makes the official a witness to the will. Keely v. Moore, 196 U.S. 38, 49 L.Ed. 376, 25 S.Ct. 169; Adams v. Norris, 23 How. 353, 16 L.Ed. 539; Murray v. Murphy, 39 Miss. 214; Re Hull, 117 Iowa 738, 89 N.W. 979; Bolton v. Bolton, 107 Miss. 84, 64 So. 967; 1 Schouler, Wills, sec. 344."
 "It was argued that, since Connor testified that he was not asked to sign as a witness, and that he did not undertake to sign as one, therefore it cannot be found that he did so. The conclusion drawn is based upon an erroneous idea of the nature of the questions involved. There is no dispute as to the language of the request, nor as to the mental attitude of the testator and of Connor. The question whether this request, the state of mind of the testator evidenced thereby, and the resulting understanding and signing on the part of Connor constitute a request for and an execution of the act of an attesting witness, is one of law. It was Connor's opinion that they did not. Accordingly, he testified that he was not requested to sign as a witness and did not do so. But that is merely his conclusion touching the law. ... He thought that the certificate of attestation by John R. Connor, justice of the peace, was a thing entirely separable from his subscribing as an individual. His testimony that he did not sign as an individual, i. e., as a 'witness,' is merely a denial of the law."
 "The occurrences between the testator and Connor include every safeguard intended to be provided by the statute. *673 Connor was fully informed and took note of the fact that the paper in question had been signed; and his signature affixed thereto identified the paper. If technical reasons could be assigned for holding that there was not a compliance with the statute, they would not be entitled to prevail against the practical reasons for the opposite result."
 Whether there was a sufficient declaration by testatrix to the witnesses that the document here involved was her will and a request that they attest to that fact, the following statement in Estate of Offill, 96 Cal.App. 640, 646 [274 P. 623], appears pertinent:
 "We think that the evidence briefly referred to herein, together with the answer 'Yes' by decedent to the doctor's question as to whether or not the instrument was his will, is sufficient to sustain the conclusion that decedent did declare to all present at the time of signing that the instrument signed was his will, and we find no testimony to the contrary. 'It is not necessary that the testator should have spoken words declaring the document to be his will, or that he should expressly request the witness to sign it as such. It is sufficient if this declaration and the request are unmistakably indicated to the persons signing as witnesses by the testator's conduct and actions, although there is no declaration in words to that effect.' (Estate of Silva, 169 Cal. 116, at 120 [145 P. 1015]; see Estate of Dow, 181 Cal. 106 [183 P. 794], and cases therein cited."
 Applying the foregoing principles of law to the evidence presented at the instant trial and hereinbefore recited, it appears that the will in question was duly authenticated pursuant to the requirements of section 50 of the Probate Code.
 For the reasons stated, the judgment is affirmed.
 Doran, J., and White, J., concurred.